IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

NO. _____

| | |
|---|---|
| CATAWBA RIVERKEEPER FOUNDATION, INC. )<br>)<br>Plaintiff,    )<br>)<br>v.    )<br>)<br>DUKE ENERGY CAROLINAS, LLC  )<br>)<br>Defendant.    )<br>_____ ) | **COMPLAINT**<br>(JURY TRIAL DEMANDED) |

## NATURE OF THE CASE

1. This citizen enforcement action challenges ongoing, unlawful discharges of toxic metals and other pollutants by Defendant Duke Energy Carolinas, LLC ("DEC" or "Defendant") at its Riverbend Steam Station coal-fired electricity generating plant ("Riverbend"), in violation of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251-1376.

2. DEC is engaged in the generation, transmission, distribution, and sale of electricity. DEC is a North Carolina LLC with its headquarters in Charlotte, North Carolina. The Riverbend coal-fired electricity generating plant is located on the banks of Mountain Island Lake in Gaston County, North Carolina; it began commercial operation in 1929. Riverbend is owned and operated by DEC.

3. Mountain Island Lake ("the Lake") was created in 1924 by damming the Catawba River. The lake is approximately 12 miles north of Charlotte, North Carolina. The lake provides

drinking water to over three quarters of a million people served by the Charlotte-Mecklenburg, Mount Holly, and Gastonia water systems.

4. For years, DEC has been polluting the waters of the United States and North Carolina by discharging large quantities of arsenic, cobalt, manganese, iron, boron, and other pollutants from coal ash impoundments located on the banks of Mountain Island Lake at Riverbend. The Riverbend site includes two adjacent coal ash lagoons of approximately 41 and 28 acres, known as the Primary Cell and Secondary Cell respectively, which contain millions of tons of coal ash. Both impoundments are unlined, and the ash is stored in a wet condition.

5. The dikes impounding these lagoons above the banks of Mountain Island Lake are as much as 80 feet high. For years, the dikes at Riverbend have been given a High Hazard rating by the N.C. Department of Environment and Natural Resources ("DENR") and U.S. Environmental Protection Agency ("EPA").

6. DEC's coal ash impoundments are located in a populated area and in an area that is used for recreation and fishing by many residents and visitors. The coal ash lagoons are directly on the banks of Mountain Island Lake, in the bend of the Catawba River. The coal ash lagoons and their unpermitted discharges are approximately three miles upstream from the primary drinking water intake for the Charlotte-Mecklenburg water system, which withdraws from the Lake. The Gastonia and Mount Holly water systems' intakes are also located downstream from the Riverbend coal ash lagoons.

7. The ash lagoons are discharging streams of contaminated water into the Lake. DEC has constructed at least four distinct riprap-lined ditches, referred to as French drains, which channel these streams of contaminated water and convey them to the Lake. The four French drains, taken together, discharge on the order of five gallons per second into the Lake, or

over 157 million gallons per year. The main channels of these drains are between 0.5 and 2 meters wide, and especially with a low lake level, the channels branch out into many smaller channels near the Lake.

8. These French drain discharges flow into Mountain Island Lake, and are not authorized by DEC's NPDES discharge permit for Riverbend.

9. In addition, at least ten more unpermitted "seeps," or streams of contaminated water – on the west side of the Primary Cell, the north side of the Secondary Cell, and the east side of both ash lagoons – discharge from the ash lagoons and flow into the Catawba River and Mountain Island Lake.

10. All these seeps and streams contain substances that were removed during the operation of the wastewater treatment of the Riverbend lagoons, including solids, sludges, materials, and pollutants. These removed substances, including solids, sludges, materials, and pollutants, have entered and are entering waters of North Carolina and navigable waters of the United States through these seeps and streams.

11. This entering of removed substances from the Riverbend lagoons, including solids, sludges, materials, and pollutants, into waters of North Carolina and navigable waters of the United States constitutes a separate violation of the CWA because it violates a provision of the Riverbend NPDES permit prohibiting removed substances, solids, sludges, materials, and pollutants from entering waters of North Carolina and navigable waters of the United States.

12. In addition, pollutants, coal ash solids, residuals, sludges, and materials from the unlined Riverbend lagoons have entered and are entering the groundwater at the Riverbend site.

13. Thus, substances removed during the operation of the wastewater treatment of the Riverbend lagoons, including solids, sludges, materials, and pollutants, have entered and are entering waters of North Carolina, including the groundwater.

14. The entering of these substances into the groundwater constitutes a separate violation of the CWA because it violates a provision of the Riverbend NPDES permit prohibiting removed substances and pollutants from entering waters of the State. The definition of waters of the State includes groundwater.

15. Moreover, the contaminated groundwater at the site flows directly into Mountain Island Lake. The groundwater is contaminated not only by the ash lagoons, but also by the old ash storage area at the southwest corner of the Primary Cell.

16. These hydrologically connected discharges from the ash lagoons and old ash storage area to surface waters of the United States constitute additional unpermitted point source discharges in violation of the CWA. Also, they further violate the NPDES permit's Removed Substances provision with respect to the contaminants discharging from the ash lagoons into the navigable waters of the United States.

17. DEC retired Riverbend in April 2013, but has not submitted a closure plan for the ash lagoons to DENR in violation of its NPDES permit, which requires the ash pond closure plan to be submitted one year prior to plant closure.

18. As long as the coal ash remains in these leaking, unlined lagoons, it will continue to discharge from the bottom and sides of the lagoons in violation of the CWA. It will also continue to place the residents and visitors to Mountain Island Lake and the drinking water customers of the Charlotte, Mt. Holly, and Gastonia water systems at risk of a catastrophic spill into the Lake.

## JURISDICTION, NOTICE, AND VENUE

19. The Catawba Riverkeeper Foundation (the "Foundation") brings this enforcement action under the citizens' suit provision of the Clean Water Act, 33 U.S.C. § 1365. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and has jurisdiction over the parties.

20. In compliance with 33 U.S.C. § 1365(b)(1)(A), and 40 C.F.R. § 135.2, on March 26, 2013, the Foundation gave Defendant, the Administrator of the United States Environmental Protection Agency ("EPA"), and DENR notice of the violations specified in this complaint and of its intent to file suit after sixty days should those violations continue. A copy of the notice letter with documentation of its receipt is attached as Exhibit A. More than sixty days have passed since the notice was given pursuant to law and regulation, and the violations identified in the notice letter are continuing at this time and are reasonably likely to continue in the future. Currently, EPA has not commenced and is not diligently prosecuting a civil or criminal action to redress the asserted violations.

21. DENR has filed an action against DEC in the Superior Court for Mecklenburg County for certain violations of North Carolina law and certain violations of the NPDES permit. *State of North Carolina v. Duke Energy Carolinas, LLC*, C.A. No. 13-cvs-9352 (the "DENR action"). However, in that action, DENR does not seek to require compliance with the standard and limitation contained in the NPDES permit prohibiting the entering of removed substances into waters of North Carolina and navigable waters of the United States, nor with the standard and limitation prohibiting unpermitted discharge from the Riverbend lagoons via the hydrologic connection between Mountain Island Lake and the contaminated groundwater that flows from the lagoons.

22. In this action, the Foundation enforces those standards and limitations, with which DENR is not seeking to require compliance in the DENR action. 33 U.S.C. § 1365 (b) (1) (B).

23. In the DENR Action, DENR seeks to enforce certain state groundwater statutes and regulations and seeks to enforce the prohibition against unpermitted discharges in the form of the seeps and streams flowing from the Riverbend lagoons.

24. However, the NPDES permit standard and limitation against allowing the entering of removed substances into the waters of North Carolina and navigable waters of the United States is an entirely separate and different standard and limitation and permit requirement.

25. The groundwater statutes and regulations of North Carolina, which are alleged in the DENR action, govern generally the contamination of groundwater in North Carolina. The Removed Substances provision of the NPDES permit, on the other hand, is a standard, limitation, condition, and requirement of operating a wastewater treatment facility, such as the Riverbend lagoons which DEC is allowed to operate in accordance with the terms of the NPDES permit. The NPDES permit's Removed Substances provision logically requires that the operator of a wastewater treatment facility must ensure that the substances it removes during the treatment process (in this instance, settling) do not enter the waters of North Carolina or the navigable waters of the United States. Otherwise, the wastewater *treatment* facility is not a wastewater treatment facility at all, but instead is a wastewater *transmission* facility and a wastewater *pollution* facility in and of itself, because it would simply move the removed substances from the wastewater into the waters of North Carolina or navigable waters of the United States and would thereby pollute those waters. That is exactly what DEC has done and is doing at its Riverbend wastewater coal ash lagoons.

26.     Further, in the DENR action, DENR alleges that DEC has committed violations of law and its permit through its unpermitted discharges in the form of seeps and streams flowing from the lagoons.  However, DENR does not allege that the transmission of pollutants from the Riverbend lagoons to Mountain Island Lake by way of the hydrologically connected groundwater is an unpermitted discharge in violation of DEC's NPDES permit.  That is an additional standard and limitation with which the Foundation seeks to require compliance in this action.

27.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 33 U.S.C. § 1365(c)(1).  The challenged discharges from the Riverbend coal ash lagoons and the violations of the NPDES permit are located and have occurred in the Charlotte Division, and Defendant DEC is a North Carolina LLC with its headquarters and principal place of business in the Charlotte Division.

## The Catawba Riverkeeper Foundation and Its Members

28.     The Foundation is a § 501(c)(3) non-profit public interest organization with members in North Carolina and South Carolina and operating in the 24 counties of the Catawba/Wateree River watershed in North and South Carolina.  The Catawba Riverkeeper Foundation's mission is to "advocate[] for the health, protection and enjoyment of the Catawba River watershed."  The Foundation works to improve water quality through monitoring and conservation advocacy, and to increase public awareness through education and partnerships with other community and conservation groups.

29.     The Foundation and its members have been harmed by DEC's unpermitted discharges.  Members of the Foundation live, recreate, and fish on Mountain Island Lake in the vicinity of and downstream from Riverbend.  They fear contamination of drinking water,

wildlife, and lake water by discharges from DEC's coal ash ponds containing arsenic and other pollutants. DEC's discharges of arsenic and other contaminants from the unlined Riverbend ash lagoons are reducing the use and enjoyment by the Foundation and its members of Mountain Island Lake and the Catawba River. Copies of standing affidavits by members of the Foundation and its Executive Director are attached as Exhibit B.

30. These injuries will not be redressed except by an order from this Court assessing civil penalties against Defendant and requiring Defendant to take immediate and substantial action to stop the flow of contaminated water and groundwater into Mountain Island Lake, to empty the impoundments of all coal combustion byproducts, to move its storage of coal ash away from banks of Mountain Island Lake and the Catawba River, to remediate the groundwater contamination at Riverbend, and to comply with the other relief sought in this action.

## STATUTORY BACKGROUND

31. The objective of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To accomplish that objective, Congress set the national goal that "the discharge of pollutants into the navigable waters be eliminated." *Id.* Accordingly, the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of pollutants from a point source to waters of the United States except in compliance with, among other conditions, a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to 33 U.S.C. § 1342.

32. Each violation of an NPDES permit – and each discharge of a pollutant that is not authorized by the permit – is a violation of the Clean Water Act. 33 U.S.C. §§ 1311(a); 1342(a); 1365(f).

33. The CWA defines a "point source" as "*any* discernable, confined, and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, [or] container . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14) (emphasis added). Under this broad definition, the discharge of pollutants from mining pits, slurry ponds, sediment basins, and mining leachate collection systems have been held to be point sources. "The term 'point source' has been taken beyond pipes and ditches and now includes less discrete conveyances, such as cesspools and ponds." *N. Cal. River Watch v. City of Healdsburg*, 2004 U.S. Dist. LEXIS 1008 (N.D. Cal. Jan. 23, 2004) (citing *Cmty. Ass'n for Restoration v. Bosma Dairy*, 305 F.3d 943, 955 (9th Cir. 2002); *Wash. Wilderness Coal. v. Hecla Mining Co.*, 870 F. Supp. 983, 988 (E.D. Wash. 1994)), *aff'd*, 496 F.3d 993 (9th Cir. 2007). *Accord U.S. v. Earth Sciences, Inc.*, 599 F.2d 368, 374 (10th Cir. 1979) ("[W]hether from a fissure in the dirt berm or overflow of a wall, the escape of liquid from the confined system is from a point source."); *Consolidation Coal Co. v. Costle*, 604 F.2d 239, 249-50 (4th Cir. 1979) (finding that "discharges from coal preparation plant associated areas," which included slurry ponds, drainage ponds, and coal refuse piles, were within CWA definition of point source), *rev'd on other grounds*, 449 U.S. 64 (1980).

34. In addition, a "point source need not be the original source of the pollutant; it need only convey the pollutant to 'navigable waters.'" *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 105 (2004); *accord W. Va. Highlands Conservancy, Inc. v. Huffman*, 625 F.3d 159, 168 (4th Cir. 2010) (permits are required for discharges from point sources that "merely convey pollutants to navigable waters"). Thus, ditches and channels that convey pollutants but are themselves not the original source constitute point sources. This includes unintentional conveyance of pollutants, for example, through naturally-formed ditches,

gullies, or fissures. *See Sierra Club v. Abston Constr. Co.*, 620 F.2d 41, 45 (5th Cir. 1980) (discharge from mining pits and spoil piles through naturally formed ditches caused by gravity flow at a coal mining site are point sources); *Earth Sciences*, 599 F.2d 368 (holding unintentional discharges of pollutants from a mine system designed to catch runoff from gold leaching site during periods of excess melting met the statutory definition of a point source); *N.C. Shellfish Growers Ass'n v. Holly Ridge Assocs., LLC*, 278 F. Supp. 2d 654, 679 (E.D.N.C. 2003) ("Notwithstanding that it may result from such natural phenomena as rainfall and gravity, the surface run-off of contaminated waters, once channeled or collected, constitutes discharge by a point source."); *O'Leary v. Moyer's Landfill, Inc.*, 523 F. Supp. 642, 655 (E.D. Pa. 1981) (intent of the discharging entity is irrelevant).

## FACTS

35. Pursuant to its delegated authority under the CWA, 33 U.S.C. § 1342(b), DENR issued NPDES permit # NC0004961 effective March 1, 2011 (the "Riverbend NPDES permit"). The Riverbend NPDES permit authorizes discharges into Mountain Island Lake from Outfall 001, which is the discharge point for once through cooling water, and Outfall 002, which discharges from the coal ash lagoons. There is also a permitted Outfall 002A, for yard sump overflow.

36. However, as set out above, there are additional, unpermitted discharges to waters of the United States beyond these permitted outfalls, flowing from the coal ash lagoons into Mountain Island Lake and the Catawba River. Inspections by the Foundation have identified a number of unpermitted discharges and flows from the coal ash lagoons into the Lake and the River.

37. DEC has publicly acknowledged these unpermitted discharges.

38. Further, in some instances DEC has even constructed so-called French drain structures to facilitate the flows of these unpermitted discharges from the coal ash lagoons into the Lake and the River. We are informed by DENR's Mooresville Regional Office that DEC has also installed piping in some locations to carry the flow of seep water away from the toe of the dikes.

39. None of these continuing discharges is authorized by the Riverbend NPDES permit or by any other permit.

40. The ash ponds at Riverbend have received coal ash that is sluiced to the ponds in a wet form, ash transport water, coal pile runoff, chemical metal cleaning wastes, and low volume waste streams from the Riverbend facility. These substances contain metals including arsenic, barium, cobalt, iron, manganese, strontium, and zinc. When the ash comes into contact with water, these metals, along with other pollutants such as boron, tend to leach or dissolve into the water.

41. Arsenic is a known carcinogen that causes multiple forms of cancer in humans. It is also a toxic pollutant, 40 C.F.R. § 401.15, and a priority pollutant, 40 C.F.R. Part 423 App'x A. Arsenic is also associated with non-cancer health effects of the skin and the nervous system.

42. The International Agency for Research on Cancer (IARC) has determined that cobalt is possibly carcinogenic to humans. Short-term exposure of rats to high levels of cobalt in the food or drinking water resulted in effects on the blood, liver, kidneys, and heart. Longer-term exposure of rats, mice, and guinea pigs to lower levels of cobalt in the food or drinking water results in effects on the same tissues (heart, liver, kidneys, and blood) as well as the testes, and also caused effects on behavior. Sores were seen on the skin of guinea pigs following skin

contact with cobalt for 18 days. Cobalt of 52 times North Carolina's interim maximum allowable contamination standard of 1 ug/L was found in the seeps.

43. Manganese is known to be toxic to the nervous system. Manganese concentrations greater than 50 ug/L render water unusable by discoloring the water, giving it a metallic taste, and causing black staining. Exposure to high levels can affect the nervous system; very high levels may impair brain development in children. The manganese sampled from the Riverbend seeps was measured at 6,400 ug/L, or 128 times North Carolina's standard of 50 ug/L.

44. Iron can render water unusable by imparting a rusty color and a metallic taste and causing sedimentation and staining; to prevent these effects, the EPA has set a secondary drinking water standard of 300 ug/L. Iron in the seeps was measured at 8,100 ug/L, 27 times the standard.

45. Oral exposure to boron has led to developmental and reproductive toxicity in multiple species. Specific effects include testicular degeneration, reduced sperm count, reduced birth weight, and birth defects.

46. Barium can cause gastrointestinal disturbances and muscular weakness. Ingesting large amounts, dissolved in water, can change heart rhythm and can cause paralysis and possibly death. Barium can also cause increased blood pressure.

47. Concurrent exposure to multiple contaminants may intensify existing effects of individual contaminants, or may give rise to interactions and synergies that create new effects. Where several coal ash contaminants share a common mechanism of toxicity or affect the same body organ or system, exposure to several contaminants concurrently produces a greater chance of increased risk to health.

48.     In at least two instances, arsenic has been found in the water of Mountain Island Lake itself in excess of the state water quality standard, including one sample that was more than twice the standard.  The residues removed during the treatment process at the drinking water treatment facility at Mountain Island Lake contain notably high levels of arsenic as well.  Zinc also has been found in Mountain Island Lake near Riverbend at almost four times the water quality standard.

49.     In addition, pollutants from coal ash have been found in groundwater under, at, and around the Riverbend Steam Station for years.  Groundwater monitoring well data from the site show the unlined ash lagoons and old ash storage area at the southwest corner of the Primary Cell have caused boron, iron, manganese, and pH to exceed their respective standards.

50.     Contaminated groundwater at Riverbend flows directly into Mountain Island Lake.  Reports filed by DEC with DENR state that groundwater at the Riverbend site flows toward Mountain Island Lake.

51.     DEC has known of the French drain discharges, seeps, and groundwater discharges from coal ash lagoons at Riverbend for years.  Despite its knowledge that these unauthorized discharges were continuing, DEC continued to deposit coal ash into the leaking, unlined impoundments, making the problem worse and pumping additional contaminants into the groundwater, Mountain Island Lake, and the Catawba River.

52.     The unlined ash lagoons continue to leach pollutants into the groundwater and discharge them into the Lake to this day, even though new ash is no longer being added to the lagoons.

# CLAIMS FOR RELIEF

53. The allegations of the preceding paragraphs are incorporated by reference as if repeated and set forth herein.

## I. Unlawful Entering of Removed Substances into State Waters and Navigable Waters of the United States.

54. DEC's NPDES permit, Part II.B.1, states that "[t]he Permittee must comply with all conditions of this permit. *Any permit noncompliance constitutes a violation of the CWA . . . and is grounds for enforcement action . . .*" Permit No. NC0004961 (emphasis added). 33 U.S.C. §§ 1365 (f)(6),1342(a); 40 CFR § 122.41(a) ("Any permit noncompliance constitutes a violation of the Clean Water Act and is grounds for enforcement action.").

55. Part II.C.6 of the permit requires that "[s]olids, sludges . . . or other pollutants removed in the course of treatment or control of wastewaters shall be utilized/disposed of . . . in a manner such as to *prevent any pollutant from such materials from entering waters of the State or navigable waters of the United States*." Permit No. NC0004961 (emphasis added).

56. The ash lagoons receive and treat various waste streams, including coal ash transport water, coal pile runoff, chemical metal cleaning wastes, and stormwater. These waste streams are treated by sedimentation in the ash lagoons. The ash settling lagoons are "an integral part of the station's wastewater treatment system," according to a Groundwater Assessment Work Plan prepared for DEC. Pollutants that have been removed in the course of treatment are stored in both ash ponds.

57. This provision prohibits the permittee from allowing coal ash contaminants removed in the course of treatment (*i.e.*, settling) as well as coal pile runoff, stormwater, and other wastewaters (all of which discharge to the ash lagoons at Riverbend) to enter the waters of North Carolina. Groundwater is included in the North Carolina pollution control statute's

definition of waters of the state. N.C. Gen. Stat. § 143-212(6). So are Mountain Island Lake and the Catawba River. The Lake and the River are also navigable waters of the United States.

58. Pollutants, solids, materials, substances, and sludges from DEC's Riverbend coal ash lagoons have for years been entering State waters and navigable waters of the United States. For years, pollutants from coal ash have been found in ground water under, at, and around the Riverbend Steam Station. Monitoring well data from the site show the unlined ash lagoons have caused boron, iron, manganese, and pH to exceed their respective standards.

59. These pollutants, solids, materials, substances, and sludges from DEC's Riverbend coal ash lagoons have for years also been entering State waters and navigable waters of the United States from seeps and streams flowing from the Riverbend coal ash lagoons.

60. The settling lagoons are a wastewater treatment system; their purpose is to treat and remove solids, sludges, substances, materials, and pollutants. They are prohibited from allowing such solids, sludges, substances, materials, and pollutants to enter waters of the State and navigable waters of the United States.

61. Instead, in violation of an express provision of its permit, DEC has been and is allowing the unpermitted and uncontrolled entrance of solids, sludges, and pollutants – including arsenic, cobalt, manganese, iron, barium, boron, strontium, and zinc, as well as total dissolved solids and acidic pH levels – into the waters of the State and navigable waters of the United States. DEC's actions are a straightforward violation of this straightforward provision of the permit.

62. Accordingly, DEC has violated its NPDES permit, and thus the Clean Water Act, by allowing and causing the entering of removed substances, including solids, sludges,

substances, materials, and pollutants to State waters and navigable waters of the United States, including the groundwater of North Carolina, Mountain Island Lake, and the Catawba River.

63.     This prohibition against the entering of removed substances and pollutants to State waters, including ground waters of the State, is enforceable through a citizen suit under the Clean Water Act.  *See* 33 U.S.C. § 1370 (allowing states to adopt and enforce more stringent limitations in CWA permits than the federal government); 33 U.S.C. § 1311(b)(1)(B) (stating that more stringent state limitations in furtherance of the objective of the CWA include "those necessary to meet water quality standards"); *Nw. Envtl. Advocates v. City of Portland*, 56 F.3d 979, 986 (9th Cir. 1995) ("The plain language of CWA § 505 authorizes citizens to enforce all permit conditions"); *Culbertson v. Coats Am.*, 913 F. Supp. 1572, 1581 (N.D. Ga. 1995) (holding that "[t]he CWA authorizes citizen suits for the enforcement of all conditions of NPDES permits").

## II.  Discharges Through Close Hydrologic Flow into the Catawba River and Mountain Island Lake

64.     According to recent documents in the files of DENR's Aquifer Protection section and prepared by DEC's own consultant, the contaminated groundwater at Riverbend flows directly into Mountain Island Lake and the Catawba River.  These unpermitted discharges of pollutants via hydrologically connected groundwater to navigable surface waters constitute an additional violation of the CWA.

65.     Unpermitted discharges of pollutants via hydrologically connected groundwater to surface waters of the United States violate the CWA.  EPA has explained repeatedly that the CWA applies to such discharges.  66 Fed. Reg. 2960, 3015 (Jan. 12, 2001) ("EPA is restating that the Agency interprets the Clean Water Act to apply to discharges of pollutants from a point source via ground water that has a direct hydrologic connection to surface water."); 56 Fed. Reg.

64876-01, 64892 (Dec. 12, 1991) ("the Act requires NPDES permits for discharges to groundwater where there is a direct hydrological connection between groundwaters and surface waters."); 55 Fed. Reg. 47990, 47997 (Nov. 16, 1990) (announcing stormwater runoff rules and explaining that discharges to groundwater are covered by the rule where there is a hydrologic connection between the groundwater and a nearby surface water body).

66. The CWA prohibits "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A). "[T]he touchstone for finding a point source is the ability to identify a discrete facility from which pollutants have escaped." *Wash. Wilderness Coal. v. Hecla Mining Co.*, 870 F. Supp. 983, 987 (E.D. Wash. 1994).

67. Because there is a direct hydrologic connection between the ash lagoons and the Catawba River and Mountain Island Lake, DEC's discharges from the lagoons via the groundwater to the river, as well as the lagoons themselves, are point sources that violate the CWA.

68. All the violations of the CWA alleged above are continuing violations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Issue a declaratory judgment stating that Defendant is violating the CWA with its ongoing unpermitted discharges of arsenic and other contaminants, and by allowing and causing the entering of such removed substances into Mountain Island Lake, the Catawba River, and the groundwater at Riverbend in violation of Defendant's NPDES permit and the CWA;

B. Enter appropriate preliminary and injunctive relief to ensure that Defendant:

    i. Prevents the flow of contaminated groundwater into Mountain Island Lake and the Catawba River;

ii. Prevents the coal ash impoundments from allowing or causing the entering of removed substances, including solids, sludges, materials, substances, and pollutants, into groundwater, Mountain Island Lake, and the Catawba River;

iii. Removes all existing coal combustion byproducts from Ponds One and Two within a reasonable amount of time and stores them in an appropriately lined industrial solid waste landfill facility away from Mountain Island Lake and the Catawba River, with appropriate monitoring;

iv. Remediates the groundwater beneath the Riverbend site resulting from its unpermitted discharges; and

v. Removes from Mountain Island Lake the pollutants it has illegally allowed to enter the Lake and that it has illegally discharged into the Lake.

C. Assess civil penalties against DEC of up to $37,500 per violation per day pursuant to 33 U.S.C. §§ 1319(d), 1365(a), and 74 Fed. Reg. 626, 627 (Jan. 7, 2009);

D. Award Plaintiff the costs of this action, including reasonable attorney and expert fees, as authorized by 33 U.S.C. § 1365(d); and

E. Grant Plaintiff such further and additional relief as the Court deems just and proper.

THE PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY

This the 11th day of June, 2013.

/s/ Frank S. Holleman III
Frank S. Holleman III
  N.C. Bar No. 43361
  fholleman@selcnc.org
Nicholas S. Torrey
  N.C. Bar No. 43382
  ntorrey@selcnc.org
Southern Environmental Law Center
601 West Rosemary Street, Suite 220

Chapel Hill, NC 27516-2356
Telephone: (919) 967-1450
Facsimile: (919) 929-9421

*Attorneys for Plaintiff*